1

2

3

4

5

6

7

8                                  UNITED STATES DISTRICT COURT

9                              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ZAYA REED,                                    No.  2:23-cv-1101 KJM CSK P

12                   Plaintiff,

13         v.                                        ORDER AND

14    OFFICER PRADO, et al.,                         FINDINGS & RECOMMENDATIONS

15                   Defendants.

16

17    **I.    INTRODUCTION**

18          Plaintiff is a county jail inmate proceeding pro se and in forma pauperis.  Defendants'

19    fully briefed motion for summary judgment or, in the alternative, partial summary judgment, is

20    before the Court.  As discussed below, the Court recommends that defendants' motion for

21    summary judgment be granted.

22    **II.   BACKGROUND**

23          On July 13, 2023, plaintiff filed a first amended complaint ("FAC").[1]  (ECF No. 7.)  On

24    August 22, 2023, plaintiff was granted the option of proceeding as to her excessive force claims

25    _____

26    [1]  In her FAC, plaintiff identified some defendants solely by their last name, and some references
      included the defendant's first initial or his or her job title.  (ECF No. 7, passim.)  In the motion for
27    summary judgment (ECF No. 18), two defendants were identified as having two last names:
      Wendy Prado Gonzalez and Marcos Martinez Mendez, and all of the defendants' first names were
28    provided.  For consistency, the Court refers to each defendant by his or her complete name.

                                                    1

against defendants Correctional Officers Wendy Prado Gonzalez, Kaylee Bubar, Marcos Martinez Mendez, Joanna Flores, and Brett Whitney, and Sergeant Toni Taylor, or she could opt to amend again in an attempt to state cognizable claims against the remaining defendants. (ECF No. 8.) On September 5, 2023, plaintiff opted to proceed solely as to her excessive force claims, and consented to the dismissal of defendants Solano County Justice Center, Well Path Medical, Lt. A. Hagen and Officer Ruiz, without prejudice. (ECF No. 9.) On October 6, 2023, defendants Solano County Justice Center, Well Path Medical, Lt. A. Hagen and Officer Ruiz were dismissed without prejudice. (ECF No. 12.) On November 14, 2023, defendants Wendy Prado Gonzalez, Kaylee Bubar, Marcos Martinez Mendez, Joanna Flores, Brett Whitney and Toni Taylor filed an answer. (ECF No. 15.) On November 20, 2023, the Court issued the discovery and scheduling order. (ECF No. 16.)

On June 14, 2024, defendants filed a timely motion for summary judgment or, in the alternative, partial summary judgment. (ECF No. 18.) Plaintiff failed to file an opposition. On July 23, 2024, plaintiff was ordered to file an opposition; when she failed to do so, the Court recommended that the action be dismissed. (ECF Nos. 21, 22.) Plaintiff filed objections. (ECF No. 23.) On October 28, 2024, plaintiff was ordered to show cause why the action should not be dismissed for lack of prosecution. (ECF No. 24.) On November 14, 2024, plaintiff filed a response to the order to show cause. (ECF No. 25.) On December 4, 2024, plaintiff was granted one final opportunity to file an opposition to the motion for summary judgment, and the findings and recommendations were left in place pending receipt of her opposition. (ECF No. 26.)

On December 9, 2024, plaintiff filed a document styled, "Order to Show Cause," but it was not signed. (ECF No. 27.) On December 20, 2024, plaintiff was granted until January 3, 2025, in which to re-submit a signed filing that also clearly identified the nature of her submission. (ECF No. 29.)

Meanwhile, plaintiff filed an opposition to the motion for summary judgment, which was entered on the Court's docket on December 19, 2024. (ECF No. 28.) This document was titled "Opposition," and included plaintiff's responses to defendants' Requests for Admissions and four pages of medical records. (Id. at 2-7, 9, 12-15.)

1    Plaintiff filed a second opposition on January 2, 2025, without leave of court.  (ECF No.

2    30.)  Plaintiff included an incomplete copy of a report from August 3, 2023.  (Id. at 4-5.)  On

3    January 17, 2025, defendants filed a reply to plaintiff's January 2, 2025 opposition.  (ECF No.

4    31.)  The findings and recommendations were vacated on February 7, 2025.  (ECF No. 32.)  On

5    March 7, 2025, after determining that the record was not complete, the Court ordered defendants

6    to file the declaration of defendant Brett Whitney and the declaration of defendant Toni Taylor

7    with Exhibit A, where the Whitney declaration and Exhibit A to the Taylor declaration were

8    missing.  (ECF No. 33 at 1-2.)  On March 12, 2025, defendants filed the declaration of defendant

9    Brett Whitney, as well as a copy of defendant Toni Taylor's declaration with the missing Exhibit

10   A.  (ECF Nos. 34, 35.)

11   **III.    VERIFIED FIRST AMENDED COMPLAINT**

12    The Court provides a summary of plaintiff's allegations in the first amended complaint.

13   As discussed in Section VI  below, some of the allegations are contradicted by the video

14   evidence.  Plaintiff claims defendant officers Wendy Prado Gonzalez, Kaylee Bubar, Marcos

15   Martinez Mendez, Joanna Flores, Brett Whitney, and Toni Taylor used excessive force against

16   her, specifically alleging the following.  On December 22, 2022,[2] after a state court appearance,

17   plaintiff was escorted back to the Justice Center Detention Facility, visibly upset and emotional

18   over her children.  (ECF No. 7 at 4.)  Defendants Wendy Prado Gonzalez and Kaylee Bubar

19   removed plaintiff's leg chains then escorted her to her cell, aggressively pulling on her and then

20   pushed her into her cell with such force that she tripped and fell to the ground, hitting her head on

21   the cement floor.  (Id.)  Plaintiff started screaming in pain and defendant Kaylee Bubar pushed

22   plaintiff onto her stomach, then used her knee to press into plaintiff's back while defendant

23   Wendy Prado Gonzalez held plaintiff's legs down.  (Id.)  Mental health arrived and told plaintiff

24   to "calm down."  (Id.)  Plaintiff was in so much pain she could not calm down, but could only cry

---

[2]  In the verified FAC, plaintiff alleges the incidents took place on December 21, 2022.  (Id. at 4.)
But in her unverified opposition, she claims the excessive force took place on December 22,
2022.  (ECF No. 30 at 2.)  In addition, the six defendants declare that the incidents took place on
December 22, 2022, and defendant Kaylee Bubar's body camera recorded the incidents on
December 22, 2022.  (ECF Nos. 18-3 to 18-7, 18-11, 34.)  The Court finds the incidents took
place on December 22, 2022.

1    hysterically.  Mental health told officers to take plaintiff to the safety cell.

2         Defendants Kaylee Bubar and Wendy Prado Gonzalez escorted plaintiff to the officer's

3    station to be cleared by medical.  After plaintiff's vitals were checked, defendants Kaylee Bubar

4    and Wendy Prado Gonzalez grabbed plaintiff's arms, pulling and then pushing her aggressively.

5    Plaintiff again fell to the ground crying hysterically, begging them to let her lay down.  Plaintiff

6    was exhausted physically and emotionally and had no energy to stand up.  (Id. at 4-5.)  This is

7    when all of the officers, defendants Wendy Prado Gonzalez, Kaylee Bubar, Marcos Martinez

8    Mendez, Joanna Flores, Brett Whitney, and Toni Taylor, jumped on plaintiff.  (Id. at 5.)  Plaintiff

9    was screaming "George Floyd" because she felt so much weight and force hit her body, the wind

10   was knocked out of her, and she was gasping for air.  (Id.)  Defendant Wendy Prado Gonzalez

11   used her upper arm to cover plaintiff's mouth and then used her body weight to apply more force

12   to stop plaintiff from screaming.  Defendant Kaylee Bubar had her knee in plaintiff's chest, using

13   her body weight to apply pressure.  (Id.)  Plaintiff was "terrified for [her] life."  (Id.)  Defendants

14   Joanna Flores and Toni Taylor were on top of plaintiff's legs with all their weight.  (Id.)  At some

15   point, plaintiff was flipped over to her stomach and slammed to the ground, hitting her right ear.

16   Plaintiff was still in belly chains and cuffed so could not break her fall.  Plaintiff's vision became

17   blurry, and she was disoriented from hitting her head, all of the officers were on top of plaintiff

18   aggressively slamming plaintiff around and added leg chains.

19        Plaintiff was carried face up down the hall to an elevator to the safety cell where

20   defendants Wendy Prado Gonzalez, Kaylee Bubar, Joanna Flores, Brett Whitney and Toni Taylor

21   threw plaintiff on the ground and while there, used their body weight and knees so plaintiff could

22   barely breathe or move, and Officer Ruiz cut off plaintiff's clothing.  Then defendant Kaylee

23   Bubar removed one arm at a time from the cuffs while defendant Joanna Flores used her knee to

24   hold plaintiff's neck down and each hand was holding each of plaintiff's arms above her head.

25   (Id. at 5-6.)  Defendants Toni Taylor, Kaylee Bubar, Wendy Prado Gonzalez, and Marcos

26   Martinez Mendez were pressing their knees into plaintiff's back and legs using all their body

27   weight.  The body chain was ripped from underneath plaintiff, tearing open her skin on her right

28   side abdomen, creating a large laceration and pain.  (Id. at 6.)  Plaintiff was told not to move

4

while the officers exited the safety cell.  Plaintiff was refused medical attention and water, left on

the floor, naked, bleeding and choking on her tears, crying hysterically, for six days.  (Id.)  As

injuries, plaintiff alleges she suffered extreme emotional distress, denied water and medical

attention, extreme pain from a large laceration to her stomach, and bruises to her head and body.

(Id. at 4.)[3]

## IV.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that the standard set forth in

Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

committee notes to 2010 amendments (recognizing that "a party who does not have the trial

burden of production may rely on a showing that a party who does have the trial burden cannot

produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

---

[3]  In the list of injuries in the FAC, plaintiff also includes loss of an unborn child.  (See FAC at 4.)  The Court does not interpret this as a claimed injury from the December 22, 2022 use of force incident where the FAC also included claims that have since been dismissed regarding medical treatment and plaintiff's pregnancy.  (See ECF No. 8 at 3-6; ECF No. 9.)  Regardless, plaintiff's medical records indicate a positive pregnancy test on February 16, 2023 and that she was prescribed prenatal vitamins, a pregnancy diet, and lower bunk assignment in February 2023, further suggesting that the December 22, 2022 use of force incident is not related to the dismissed pregnancy-related allegations.  (See ECF No. 28 at 15.)

5

should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled on other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes to 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R.

1    Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

2    255.  All reasonable inferences that may be drawn from the facts placed before the court must be

3    drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

4    are not drawn out of the air, and it is the opposing party's obligation to produce a factual

5    predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

6    Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

7    demonstrate a genuine issue, the opposing party "must do more than simply show that there is

8    some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

9    not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

10   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

11          Defendants have submitted video footage of the underlying incident from defendant

12   Officer Kaylee Bubar's body camera.[4]  (ECF No. 18-11.)  The Supreme Court stated that when

13   ruling on motions for summary judgment, courts "should [ ] view[ ] the facts in the light depicted

14   by the videotape."  Scott v. Harris, 550 U.S. 372, 380-81 (2007) (following review of videotape,

15   Supreme Court held deputy acted reasonably in terminating car chase and did not violate

16   respondent's Fourth Amendment right against unreasonable seizure).  However, courts are still

17   required to draw all reasonable inferences in the nonmovant's favor.  Vos v. City of Newport

18   Beach, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light most favorable to

19   the nonmovants . . . so long as their version of the facts is not blatantly contradicted by the video

20   evidence.");  Williams v. Las Vegas Metro. Police Dep't, 2016 WL 1169447, at *4 (D. Nev. Mar.

21   22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment:  in

22   general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing

23   Blankenhorn v. City of Orange, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).  Thus, the Court considers

24   the video footage, drawing all reasonable inferences in plaintiff's favor.

25          By notice issued June 17, 2024 (ECF No. 19), plaintiff was advised of the requirements

26   for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See

27

28   [4]   The video footage is labeled "Axon Body 3 X60A1161C."  (ECF No. 18-11 (hereafter "VF").)

7

1  Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).  Plaintiff was provided the Rand

2  notice again on July 23, 2024.  (ECF No. 21 at 3.)

3  **V.     PRELIMINARY ISSUES**

4         Before turning to the merits, the Court first addresses issues regarding plaintiff's multiple

5  oppositions, plaintiff's failure to comply with the Local Rules, plaintiff's failure to timely respond

6  to Requests for Admission ("RFA"), defendants' evidentiary objections, and defendants' request

7  for judicial notice.  Given plaintiff's pro se status, at every opportunity, the Court has given

8  plaintiff the benefit of the doubt in resolving these issues.

9         **A.  Plaintiff's Multiple Late Oppositions**

10        Plaintiff filed her first opposition to defendants' motion for summary judgment five

11  months after the motion was filed, and after being provided multiple reminders, warnings, and

12  notices.  See Docket.  Plaintiff then filed a second opposition two weeks after filing her first

13  opposition, without leave of court.  (ECF No. 30.)  Defendants filed a reply responding to this

14  second opposition, and the Court therefore will consider both oppositions filed by plaintiff.

15  Because the Court has excused plaintiff's multiple late filings, the Court will also excuse

16  defendants' late filing of defendant Whitney's declaration and the exhibit to defendant Taylor's

17  declaration.

18        **B.  Failure to Comply with Local Rule 260**

19        Defendants argue that they are entitled to summary judgment because plaintiff's

20  opposition to defendants' motion (ECF No. 18) fails to comply with Local Rule 260(b), which

21  requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts

22  in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those

23  that are disputed, including with each denial a citation to the particular portions of any pleading,

24  affidavit, deposition, interrogatory answer, admission, or other document relied upon in support

25  of that denial."  L.R. 260(b).  Defendants filed a statement of undisputed facts as required by

26  Local Rule 260(a).  (ECF No. 18-2.)  Defendants argue that in her opposition, plaintiff fails to

27  address defendants' statement of undisputed facts.  (ECF No. 31 at 1.)

28        Defendants are correct that plaintiff failed to address defendants' statement of undisputed

facts with plaintiff's responses, as required by Local Rule 260(b).  "Pro se litigants must follow the same rules of procedure that govern other litigants."  <u>King v. Atiyeh</u>, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), <u>overruled on other grounds</u>, <u>Lacey v. Maricopa County</u>, 693 F.3d 896, 928 (9th Cir. 2012) (<u>en banc</u>).  However, the Ninth Circuit instructs district courts to "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly."  <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010).  Further, plaintiff's failure to comply with Local Rule 260(b) is not grounds alone to grant defendant's motion for summary judgment.  <u>See</u> <u>Martinez v. Stanford</u>, 323 F.3d 1178, 1182 (9th Cir. 2003) ("A motion for summary judgment cannot be granted simply because the opposing party violated a local rule. . . .") (citations omitted).  In addition, plaintiff's FAC is verified and may serve as her affidavit in opposition to the motion for summary judgment.  <u>See</u> <u>Lopez v. Smith</u>, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000).

Accordingly, the Court considers the record before it in its entirety despite plaintiff's failure to comply with the applicable Local Rules.  However, only those assertions in plaintiff's verified pleading that are based on her personal knowledge or have evidentiary support in the record are considered.

**C. Withdrawal of Admissions to Requests for Admissions**

Defendants contend that because plaintiff failed to respond to their RFAs, all facts were conclusively established by such failure, and their RFAs are deemed admitted for purposes of this litigation.  (ECF No. 18-1 at 9-10.)  In her first opposition, plaintiff provided late responses to the RFAs that bear her signature.  (ECF No. 28 at 2-7.)  Defendants did not address her late responses.  (ECF No. 31.)

When a party fails to timely respond to requests for admissions, those requests are automatically deemed admitted.  <u>See</u> Fed. R. Civ. P. Rule 36(a); <u>Federal Trade Commission v. Medicor LLC</u>, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) ("[n]o motion to establish the admissions is needed because Federal Rule of Civil Procedure 36(a) is self-executing.").  However, a district court has discretion to grant relief from an admission under Rule 36(b) when: (1) "it would promote the presentation of the merits of the action" and (2) "the party who

9

1   obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that

2   party in maintaining the action or defense on the merits." Conlon v. United States, 474 F.3d 616,

3   621 (9th Cir. 2007) (citing Hadley v. United States, 45 F.3d 1345, 1348 (9th Cir. 1995)). "The

4   first half of the test in Rule 36(b) is satisfied when upholding the admission would practically

5   eliminate any presentation of the merits of the case." Hadley, 45 F.3d at 1348. Under the second

6   half of the Rule 36(b) test, "[t]he party relying on the deemed admission has the burden of

7   proving prejudice." Conlon, 474 F.3d at 622. "The prejudice contemplated by Rule 36(b) is 'not

8   simply that the party who obtained the admission will now have to convince the factfinder of its

9   truth. Rather, it relates to the difficulty a party may face in proving its case, e.g., caused by the

10   unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the

11   questions previously deemed admitted." Hadley, 45 F.3d at 1348 (citing Brook Village N.

12   Assocs. v. General Elec. Co., 686 F.2d 66, 70 (1st Cir. 1982)). The party who obtained the

13   admission has the burden of proving that the withdrawal of the admission would prejudice the

14   party's case. Hadley, 45 F.3d at 1348 (citation omitted).

15       Despite plaintiff's failure to provide timely responses to the RFAs, the Court finds that the

16   factors set forth above weigh in favor of granting relief to plaintiff under Rule 36(b). In this case,

17   the RFAs are extensive. (ECF No. 18-8 at 5-8.) By failing to respond to the requests, plaintiff

18   admitted the relevant facts to each claim against all defendants. Upholding the admissions would

19   effectively eliminate consideration of the merits of this case. See Hadley, 45 F.3d at 1345.

20   Moreover, although defendants argue the failure to respond means the RFAs are deemed

21   admitted, defendants failed to address the issue of prejudice. (ECF Nos. 18-1 at 8-10; 31 at 3-5.)

22   The evidence provided with defendants' motion demonstrates a lack of prejudice to defendants if

23   the RFAs are withdrawn. All of the defendants provided declarations concerning the events of

24   December 22, 2022, and no key witness appears to be unavailable. The FAC contains plaintiff's

25   detailed account of what took place during the alleged use of force incident. Based on her

26   detailed allegations, it would be difficult for defendants to argue they were prejudiced because

27   plaintiff failed to timely respond to requests asking her to admit that the allegations in the FAC

28   were not true. The Court finds that defendants failed to meet their burden in showing they would

1  be prejudiced by the withdrawal of the admissions.

2       Overall, the Court exercises its discretion under Rule 36(b), and grants plaintiff relief and

3  deems the automatic admissions to the RFAs withdrawn.  See Ervin v. Merced Police Dep't, 2015

4  WL 5896059, at *3-4 (E.D. Cal. Oct. 6, 2015), clarified on denial of reconsideration, 2015 WL

5  13236885 (E.D. Cal. Nov. 20, 2015); Lyons v. Santero, 2011 WL 3353890, at *3 (C.D. Cal. May

6  11, 2011).

7       The Court will consider plaintiff's signed responses to the RFA, which plaintiff included

8  with her first opposition.  The Court will not consider, however, plaintiff's unsigned responses.

9  After the signed responses to the RFAs, plaintiff set forth an unsigned, one page list of the RFAs

10  with shorter responses, such as "true," "false," and "no contest."  (ECF No. 28 at 9.)

11       **D.  Evidentiary Objections**

12       Defendants raise two evidentiary objections.  First, defendants object that plaintiff's

13  documents are not authenticated, and plaintiff did not attach an affidavit authenticating through

14  personal knowledge the documents referenced by plaintiff.  (ECF No. 31 at 2-3, 6.)  Defendants

15  refer to two pages of documents attached to plaintiff's opposition.  (Id. at 6.)  The two pages

16  submitted by plaintiff are portions of an "Involved Party Report" dated August 3, 2023.  (ECF

17  No. 30 at 4-5.)

18       The Court agrees that the two documents appended to plaintiff's second opposition (ECF

19  No. 30 at 4-5) are not properly authenticated, as plaintiff did not include her own declaration or a

20  declaration from another individual as to the authenticity of the documents.  Plaintiff's opposition

21  is also not signed under penalty of perjury.  Moreover, the August 3, 2023 report is not complete.

22  But even if a complete report were produced and authenticated, it is not relevant to whether any

23  of the defendants used excessive force on December 22, 2022.  Defendants' objections are

24  sustained, and the Court has not considered these two documents (ECF No. 30 at 4-5) in

25  addressing the motion for summary judgment.

26       Second, defendants object that plaintiff failed to present any admissible evidence.  (ECF

27  No. 31 at 6.)  However, because plaintiff's FAC is verified, the Court may consider plaintiff's

28  statements based on her personal knowledge contained in the FAC.  See Schroeder v. McDonald,

1   55 F.3d 454, 460 (9th Cir. 1995). In addition, plaintiff provided her signed responses to RFAs,

2   albeit belated, as well as four pages of medical records. (ECF No. 28 at 2-7, 12-15.) Although

3   the medical records are not authenticated, given plaintiff's pro se status, the Court will consider

4   the medical records, where relevant, because plaintiff could remedy the deficiency if the case

5   proceeds to trial. See Powell v. City of Elko, 2024 WL 4137289, at *7-8 (D. Nev. Sept. 4, 2024)

6   (overruling objection that magistrate judge should not have considered medical records submitted

7   by prisoner plaintiff on motion for summary judgment because defendants did not appear

8   genuinely to contest authenticity of records but only procedure by which plaintiff submitted

9   them).

10        **E.  Request for Judicial Notice**

11       Defendants ask the Court to take judicial notice of the December 28, 2022 felony

12   complaint filed against plaintiff in People v. Reed, No. FCR366683 (Sacramento Cnty., Cal.),

13   alleging that plaintiff committed battery upon a custodial officer, defendant Wendy Prado

14   Gonzalez. (ECF No. 18-9, citing ECF No. 18-8 at 12-13.)

15       A federal court may take judicial notice of adjudicative facts. Fed. R. Evid. 201(a)-(c). A

16   court may also take judicial notice of court records. See MGIC Indem. Co. v. Weisman, 803 F.2d

17   500, 505 (9th Cir. 1986); Lee v. City of Los Angeles, 250 F.3d 668, 689-90 (9th Cir. 2001) (court

18   may take judicial notice of dismissal and ground therefore, but not of disputed facts therein).

19   Proper subjects of judicial notice include "court filings and other matters of public record."

20   Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); United States

21   v. Howard, 381 F.3d 873, 876 n.1 (9th Cir. 2004); Fed. R. Evid. 201(b)(2).

22       Defendants' request for judicial notice is granted, and the Court takes judicial notice of the

23   felony complaint filed against plaintiff in state court. (ECF No. 18-9.)

24   **VI.    EXCESSIVE FORCE CLAIM**

25       While the Court expresses its sympathy for the challenges and heartache plaintiff

26   experienced after being separated from her children, the Court must evaluate plaintiff's excessive

27   force claim to determine whether the force used by defendant officers was reasonable "from the

28   perspective of a reasonable officer on the scene," evaluating the facts and circumstances.

1    Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015).  Critically, on the two days immediately

2    preceding the bail hearing and the underlying use of force incident, plaintiff was detained in the

3    same county jail, was placed on suicide watch, and was housed in the safety cell on December 20

4    and 21, 2022.  (ECF No. 28 at 12.)  After plaintiff was denied bail at a December 22, 2022 state

5    court hearing, plaintiff was emotionally distraught.  In the video footage, plaintiff was visibly

6    upset, crying, and screaming, lamenting not being able to see her children.  (VF, passim.)  After

7    being escorted to the first cell, plaintiff was standing, but then dropped to her knees on her own

8    and forcibly struck her own head against the cell wall while crying and screaming.  VF 13:55:34-

9    13:56:30.  Officers did not place plaintiff on the ground until after she hurt herself.  VF 13:56:41.

10    Multiple officers tried to comfort and calm plaintiff, from defendant Officer Bubar placing

11    a blanket between plaintiff's head and the cell wall, officers speaking to plaintiff calmly, officers

12    explaining to plaintiff that they "need[ed] to make sure that you're safe," and officers escorting

13    plaintiff to the medical station to get checked.  VF 14:00:49-14:01:19, 14:02:35-37, 14:04:32-

14    14:05:11; Kaylee Bubar Decl. ¶ 10 (ECF No. 18-4).  Mental health and medical staff determined

15    plaintiff needed to be placed on suicide watch and in the safety cell.  Toni Taylor Decl. ¶ 8 (ECF

16    No. 18-7); Marcos Martinez Mendez Decl. ¶ 11 (ECF No. 18-5); Wendy Prado Gonzalez Decl.

17    ¶ 8 (ECF No. 18-3).  After plaintiff's vitals were taken at the medical station, officers began to

18    escort plaintiff to the safety cell, and things significantly deteriorated once plaintiff realized she

19    was being taken to the safety cell as plaintiff began to thrash, fell to the floor, resisted, kicked

20    defendant Officer Bubar, and bit defendant Prado Gonzalez, yelling that she did not want to

21    return to the safety cell.  VF 14:06:32-14:07:15; Kaylee Bubar Decl. ¶¶ 16-17; Wendy Prado

22    Gonzalez Decl. ¶ 11.  Four officers then had to carry plaintiff to the safety cell.  See VF 14:08:30;

23    Wendy Prado Gonzalez Decl. ¶ 13.

24    The use of force challenged here must be evaluated from the perspective of a reasonable

25    officer on this scene, responding to an inmate who was crying and screaming about not being able

26    to see her children, who physically hurt herself by striking her head forcibly against a cell wall

27    after being on suicide watch and housed in a safety cell for two days preceding this incident, and

28    who vigorously resisted being taken back to the safety cell.  The Court ultimately concludes that

1  the use of force here was objectively reasonable and that summary judgment should be granted to

2  defendants.

3       **A. Legal Standard for Fourteenth Amendment Claims Alleging Excessive Force**

4       The Due Process Clause of the Fourteenth Amendment protects a post-arraignment,

5  pretrial detainee from the use of excessive force that amounts to punishment.  Graham v. Connor,

6  490 U.S. 386, 395 n.10 (1989) (citing Bell v. Wolfish, 441 U.S. 520, 535-39 (1979)).  To prove

7  an excessive force claim under Section 1983, a pretrial detainee must show only that the "force

8  purposely or knowingly used against him [or her] was objectively unreasonable."  Kingsley, 576

9  U.S. at 397.  "A court must make this determination from the perspective of a reasonable officer

10  on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."

11  Id.  "A court (judge or jury) cannot apply this standard mechanically."  Id.  "[O]bjective

12  reasonableness turns on the 'facts and circumstances of each particular case.'"  Id. (quoting

13  Graham, 490 U.S. at 396).

14       In determining whether the force used was reasonable, courts may consider "the

15  relationship between the need for the use of force and the amount of force used; the extent of the

16  plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the

17  severity of the security problem at issue; the threat reasonably perceived by the officer; and

18  whether the plaintiff was actively resisting."  Kingsley, 576 U.S. at 397.  The Kingsley standard

19  applicable to excessive force claims by pretrial detainees is purely objective, therefore it does not

20  matter whether the defendant understood that the force used was excessive or intended it to be

21  excessive.  Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc).  A

22  pretrial detainee can prevail by providing "objective evidence that the challenged governmental

23  action is not rationally related to a legitimate governmental objective or that it is excessive in

24  relation to that purpose."  Id. (internal quotation marks and citation omitted).

25       **B. Defendants' Evidence**

26       Defendants provided declarations from the six defendants.  (ECF Nos. 18-3 to 18-7, 34,

27  35.)  In addition, defendants provided the video footage from defendant Bubar's body camera.

28  VF (ECF No. 18-11).

1    **C.  Plaintiff's Evidence**

2          In addition to her verified FAC, plaintiff provided signed responses to the RFAs and

3    excerpts of her medical records.[5]  (ECF No. 28 at 2-7, 9, 12-15.)

4    **D.  December 22, 2022 Incident**

5          The Court reviewed the video footage from defendant Bubar's body camera, labeled

6    "Axon Body 3 X60A1161C," from December 22, 2022, at the Solano County Justice Center

7    Detention Facility in Fairfield, California.[6]  (ECF No. 18-11.)  The video shows plaintiff being

8    escorted walking to a cell; in the cell, plaintiff dropping on her own to her knees from standing

9    and then forcibly striking her own head against the cell wall; mental health was called and

10   responded to the cell; plaintiff was escorted walking to the medical station; while being

11   transferred to a safety cell, plaintiff began physically resisting and thrashing, and was then carried

12   to the safety cell; and plaintiff was placed in a safety cell.  See VF.

13         At VF 13:54:39, plaintiff was crying while standing, with handcuffs, waist restraints and

14   leg irons.  Her leg irons were removed, and in response to plaintiff's cries, defendant Wendy

15   Prado Gonzalez (a female officer) asks plaintiff, "Do you want some time out in the yard?"  VF

16   13:54:51-13:54:55; Wendy Prado Gonzalez Decl. ¶ 5.  Plaintiff did not respond and was then

17   escorted to her cell, still crying, at times screaming, over the loss of access to her children and a

18   man who is keeping her from her children.  VF 13:54:51-13:55:34.  Upon entering the cell,

19   plaintiff was placed, still standing, against the cell wall, screaming, including screaming "I'm not

20   ok!"  VF 13:55:34-13:56:03. Then plaintiff, while moaning and crying, dropped to her knees, and

21   an officer says, "Reed, I know that you're upset."  VF 13:56:04-13:56:20.  Still crying and

22   screaming, plaintiff then thrusts her head hitting it against the cell wall.  VF 13:56:29-30.

23   Correctional officers immediately respond, placing her on the ground.  VF 13:56:41.  Plaintiff

24

25   ─────────────────────
     [5]  In her FAC, plaintiff claims that her lawyer took a picture of her injuries (ECF No. 7 at 6), but
26   plaintiff did not provide any photo of her injuries.  In her first opposition, plaintiff stated that she
     had signed an affidavit which she wanted to use as evidence in this motion (ECF No. 28 at 1), but
     she did not provide an affidavit with either opposition.  (ECF Nos. 28, 30.)

27
     [6]  The body camera video displays a date and time stamp in the top right corner of the video.  The
28   Court cites to specific times displayed in the video footage.

15

continued crying and screaming.  VF 13:56:41- 13:56:53.  Plaintiff yelled, "You're evil!  You're just as evil as he is!"  VF 13:56:54-56.  Defendant Officer Kaylee Bubar placed a blanket between plaintiff's head and the cell wall.  VF 13:56:54-13:56:56; Bubar Decl. ¶ 10.  Plaintiff continues to cry and scream, "leave me alone."  VF 13:56:56-13:56:57.  Plaintiff remained on the cell floor, with her head on the blanket, crying inconsolably and screaming, "You're breaking my soul.  You're breaking my spirit.  I don't want to do this anymore," while a correctional officer held their hands on plaintiff's back.  VF 13:56:57-13:58:42.

One of the female correctional officers announced mental health had arrived, and asked plaintiff if she would talk to her, to listen to what she (mental health) has to say, while a male correctional officer says, "Miss Reed, it would be very helpful if you talk to someone."  VF 13:58:58:43-13:58:51.  A female staff person says, "I'm right here" multiple times, "We have to keep you safe," and "I'm here with you," as plaintiff continued crying, at times repeatedly crying "I just want my babies."  VF 13:58:52-14:00:51.  A female staff person quietly responded, "of course you do."  VF 14:00:49-51.  Plaintiff continued crying, while a female staff person tried to calm plaintiff down, "We have to keep you safe so that you can see them again.  We gotta get you well so you can see them again.  …But we can't do that if you're not here with us, okay.  And they need you.  Your babies need you, okay?  They need you to be well.  Okay?  And that's the work that we do together."  VF 14:00:52-14:01:52.

Plaintiff continued crying, claiming she needed to get out of there, she needed a lawyer.  VF 14:01:53-14:02:10.  Plaintiff then yelled, "I'm not, I'm not," lifting her head yelling, "Don't restrain me any further.  I'm not going to hurt myself."  VF 14:02:13-14:02:19.  Plaintiff then laid back down and resumed crying.  VF 14:02:27-14:02:34.  A female officer told plaintiff, "we need to make sure that you're safe."  VF 14:02:35-14:02:37.  Plaintiff then started talking about events at her house, including obtaining a restraining order.  VF 14:02:38-14:02:46.  Plaintiff then laid quietly for a bit, while officers asked for a medical bag.  VF 14:02:48-14:03:01.  An officer approached plaintiff and asked her name; plaintiff responded, "Zaya."  VF 14:03:02-14:03:05.  The female officer said, "you came in yesterday, right," and asked plaintiff what was going on; plaintiff responded "nothing, I don't know why they're on me."  VF 14:03:06-14:03:13.  The

1   officer asked if plaintiff had hit her head, plaintiff responded "yeah," and the officer asked to look

2   at her head; plaintiff confirmed she hit the top of her head, and then said, "there's nothing wrong.

3   I've been beaten up by him for many years," and "It's alright, it's alright, I can take a hit."  VF

4   14:03:14-14:03:32.  Plaintiff then laid quietly.  VF 14:03:32-14:04:18.  The medical officer

5   wanted to take plaintiff's vitals, and defendant Kaylee Bubar asked plaintiff if she could stand up

6   on her own.  VF 14:04:15-14:04:18; Bubar Decl. ¶ 14.  Officers released plaintiff's legs, and she

7   stood up.  VF 14:04:18-14:04:31.

8          Plaintiff was escorted standing to the medical station without incident where she sat in a

9   chair.  VF 14:04:32-14:05:11.  She cried quietly while her vitals were taken; plaintiff denied

10  having chest pains, and the female medical officer remarked that plaintiff was dehydrated.  VF

11  14:05-14:06:03.  Mental health staff determined that plaintiff would be placed in a safety cell on

12  suicide watch.  Wendy Prado Gonzalez Decl. ¶ 8; Marcos Martinez Mendez Decl. ¶ 11; Toni

13  Taylor Decl. ¶ 9.

14         Officers then had plaintiff stand up, and began escorting her.  VF 14:06:08-14:06:18.

15  Plaintiff asked where they were taking her, and after a female officer responded, plaintiff replied,

16  "Not back to that room right?" again becoming upset.  VF 14:06:19:14:06:21.  Plaintiff started

17  crying loudly, "No, I don't want to go back there," then began screaming and thrashing away

18  from the officers, while the officers verbally tried to get plaintiff to breathe and calm down, while

19  plaintiff screamed, "leave me alone," "leave me alone," and "I don't want to go back there."

20  VF 14:06:22-14:07:00.  Within that time frame, the following happens:  at VF 14:06:32 plaintiff

21  fell to the floor.  At VF 14:06:39-14:06:40, an officer yells, "Don't bite!"  At VF 14:06:52,

22  plaintiff is prone on the floor.  At VF 14:06:58, officers are applying leg irons.  At VF 14:07:00-

23  14:07:01, plaintiff yells, "I don't want to go back in there!"  Plaintiff is resisting, thrashing and

24  kicking her legs, and the officers bring plaintiff to the ground.  VF 14:07:00-14:07:15.  At

25  VF 14:07:03-14:07:04, an officer orders plaintiff to stop resisting.  After plaintiff is on the floor,

26  and objects that they are hurting her, she again begins thrashing about, yelling, "I just want to go

27  to sleep!" continues screaming, then crying, and then claiming she can't breathe.  VF 14:07:14-

28  14:07:26.  Officers continue applying leg irons.  VF 14:07:25-14:07:35.  Plaintiff continues

1   screaming and crying, and begging them to take her back to her room, that she wanted to go back

2   to sleep.  VF 14:07:36-14:08:28.

3       The officers then lift plaintiff up and carry her toward the safety cell while plaintiff

4   continues to physically resist, scream and cry, yelling that she doesn't want to go back in there,

5   she just wants her kids, and get away from her.  VF 14:08:30-14:09:33.  An officer continues her

6   verbal efforts to get plaintiff to breathe, and to stop.  VF 14:09:30-14:09:33.  While they are on

7   the elevator, plaintiff continued crying, and the officers shift the position they are holding her and

8   plaintiff asks them to "let my pinky go!" and then yells, "My wrist," "Ow, Ow, Ow, Ow, Ow!"

9   and "Oh my God, you're hurting me!"  VF 14:09:56-14:10:05.  The officers continue to hold

10  plaintiff and carry her off the elevator as she continues moving, screaming, crying, and yelling.

11  VF 14:10:06-14:10:33.

12      The video footage does not show the entry into the safety cell as the body camera is

13  briefly blocked by the officer's uniform during the movement, though the audio continues.

14  Plaintiff is next shown prone on the floor in the safety cell, and officers are telling plaintiff to

15  breathe.  VF 14:11:00-14:11:07.  A female officer orders plaintiff "do not move."  VF 14:11:25-

16  26, 14:11:28-29.  Plaintiff says, "you're hurting me," and "Why?  I'm not hurting you."  VF

17  14:11:28-14:11:32.  An officer begins cutting off plaintiff's clothes, plaintiff continues screaming

18  and crying.  VF 14:11:34-14:11:44.  Female officers again order plaintiff to breathe, to relax, and

19  to stop moving.  VF 14:11:44-14:11:51.  Plaintiff says something about George Floyd, and yells

20  that she can't breathe.  VF 14:12:12-14:12:20.  Plaintiff lays quietly on the floor, then starts

21  coughing.  VF 14:12:21-14:12:39.  Plaintiff then demands the officers get off her legs, and begins

22  screaming and cursing again, while officers continue cutting off her clothes.  VF 14:12:42-

23  14:14:09.  Plaintiff yells "Ow, Ow, ow" and continues crying.  VF 14:14:02-14:14:07.  A female

24  officer orders plaintiff to relax her legs.  VF 14:14:08-09-14:14:12.  Plaintiff responds that she

25  can't because they were hurting her, and then resumes screaming.  VF 14:14:09-14:14:17.

26  Plaintiff screams she can't breathe.  VF 14:14:17-19.  A female officer tells plaintiff to relax, and

27  "stop tensing up," and plaintiff responds that "you're hurting my legs," and "Ow! Ow!"  VF

28  14:14:20-14:14:58.  A female officer tells plaintiff "Listen, we are going to unrestrain you and get

1  off of you, but we need you to not move your legs." VF 14:15:00-14:15:05. Plaintiff continues

2  crying, and the female officer commands, "we're going to unrestrain you and leave the room, but

3  you need to stay on the ground until we leave, do you understand?" VF 14:15:10-14:15:16.

4  Plaintiff responded yes, but then cried out, "Ow, Ow, Ow" and "get off of me, please." VF

5  14:15:17-32. The officers leave the safety cell. VF 14:16:15.

6      **E. Discussion**

7          ***1. Plaintiff's Claimed Injuries and Medical Records***

8          In her FAC, plaintiff alleges she suffered bruises to her head and body, and a laceration to

9  her abdomen when Officer Ruiz ripped the waist chains from underneath plaintiff. (ECF No. 7 at

10  4, 6.) Plaintiff submitted four pages of excerpts of different medical records with her opposition,

11  which are summarized here. (ECF No. 28 at 12-15.)

12          On December 20, 2022, plaintiff was placed on suicide watch and placed in a safety cell

13  after she reported suicidal ideation, stating "I can't do it anymore" and then showing prison staff

14  "the towel that she wanted to use to strangle herself." (Id. at 12.) She remained on suicide watch

15  and in a safety cell on December 21, 2022. (Id.) On December 22, 2022, custody officers

16  witnessed plaintiff "intentionally hitting her head against cell wall." (Id. at 13.) An undated

17  medical record that appears to be from December 22, 2022 notes "Assessment: chest wall

18  abrasion, likely related to friction"; plaintiff reported abrasion resulting from an altercation with

19  officers after plaintiff "hearing bad news in court"; and plaintiff reported she was held down on

20  her head, had a headache, and had chest pain. (Id.) The medical record does not, however,

21  indicate a laceration to plaintiff's abdomen or bruises. (See id.) On December 31, 2022, plaintiff

22  requested medication and was anxious, and was seen by a psychiatrist on January 1, 2023. (Id. at

23  14.)

24          Plaintiff submitted excerpts of medical records from January and February 2023. (See

25  ECF No. 28 at 14-15.) These records are not relevant because the claims related to medical care

26  in January 2023 and related to her pregnancy were dismissed. (ECF No. 8 at 3-6; ECF No. 9.)

27  Therefore, the Court does not consider these records, which are not related to the December 22,

28  2022 incident underlying plaintiff's excessive force claims.

19

1              ***2. Reasonableness of Use of Force***

2              The Court viewed the video footage from defendant Kaylee Bubar's body camera, labeled

3      "Axon Body 3 X60A1161C," from December 22, 2022, at the Solano County Justice Center

4      Detention Facility in Fairfield, California.  (ECF No. 18-11.)  Following the Supreme Court's

5      instruction, the Court views the facts as depicted by the video evidence, see Scott, 550 U.S. at

6      380-81, drawing all reasonable inferences in plaintiff's favor so long as plaintiff's version is not

7      contradicted by the video evidence, see Vos, 892 F.3d at 1028.  Even after drawing all reasonable

8      inferences in plaintiff's favor, withdrawing the automatic admission of defendants' requests for

9      admission, excusing plaintiff's failure to respond to defendants' statement of undisputed facts,

10     and permitting plaintiff to submit two late oppositions, the Court concludes that defendants' use

11     of force was reasonable under the circumstances, and defendant officers are entitled to summary

12     judgment.

13             It is undisputed that plaintiff was emotionally distraught after returning to the jail from her

14     state court proceeding.  In the video footage, plaintiff was visibly upset, crying, and screaming,

15     lamenting the loss of her children.  Although plaintiff was already handcuffed and wearing waist

16     restraints, after she was taken to her cell, she dropped to the ground on her own and struck her

17     head into the cement cell wall.

18             Plaintiff's allegations in the FAC are contradicted by video evidence.  Contrary to

19     plaintiff's allegations in the FAC, the video does not show officers aggressively pulling on

20     plaintiff during the escort to her cell or pushing plaintiff into her cell with such force that she

21     tripped and fell to the ground, hitting her head on the cement floor.  Rather, the video shows

22     plaintiff dropping to her knees on her own and then striking her own head into the cell wall.

23     Indeed, in her response to RFA 10, plaintiff admitted she thrust her head against the wall.  (ECF

24     No. 28 at 5.)  Plaintiff's actions in thrusting her own head against the cell wall supported the

25     officers' decision to place plaintiff on the ground and to call mental health to evaluate plaintiff.

26     Defendants' concern for plaintiff's safety is also supported by the medical evidence provided by

27     plaintiff showing she was previously on suicide watch, and housed in the safety cell on December

28     20 and 21, 2022.  (ECF No. 28 at 12.)  The video shows the defendant officers attempting to calm

                                                     20

1   plaintiff down, speaking to her in calm voices, placing a blanket down to protect plaintiff's head

2   from further injury should she break free and attempt to strike her head again.  The video does not

3   show officers pushing, striking, hitting or kicking plaintiff.  The video confirms that officers

4   called mental health staff to come speak with plaintiff and attempt to calm her down, and called

5   medical staff to evaluate plaintiff's potential head injury.

6       The video confirms plaintiff walked to the medical station and sat quietly in the chair

7   while her vitals were taken.  No use of force took place during the escort to the medical station, or

8   while plaintiff was examined at the medical station.

9       It is undisputed that mental health staff and medical staff determined that plaintiff needed

10  to be placed in a safety cell on a 1056 watch due to her behavior.  (Wendy Prado Gonzalez Decl.

11  ¶ 7, Ex. A; Toni Taylor Decl. ¶ 7; Marcos Martinez Mendez Decl. ¶ 10; Brett Whitney Decl. ¶

12  10.)

13      Once plaintiff stood up from the chair at the medical station and officers began escorting

14  her in a different direction, plaintiff asked where she was being taken, and once she realized they

15  were taking her back to the safety cell, the video shows that plaintiff began physically resisting,

16  thrashing, and screaming that she did not want to go back there.  Plaintiff admits she "fell to the

17  ground crying hysterically begging [defendants] to please let me lay down."  (ECF No. 7 at 4.)

18  Plaintiff's resistance required the defendants to use additional force to escort her to the safety cell

19  where she was going to be housed to protect plaintiff from further self-harm.  See Madrid v.

20  Gomez, 889 F. Supp. 1146, 1254 (N.D. Cal. 1995) ("correctional officers must react, sometimes

21  quite forcefully, to subdue an uncooperative or combative inmate.").  The video shows the

22  defendants calmly addressing plaintiff's resistance, ordering plaintiff to calm down and stop

23  resisting.

24      It is undisputed that the two male officers who assisted in carrying plaintiff to the safety

25  cell, defendants Brett Whitney and Marcos Martinez Mendez, exited the safety cell after placing

26  plaintiff in the safety cell and the male officers were relieved by two female officers.  See Toni

27  Taylor Decl. ¶ 14 ("Officer Ruiz and Officer Flores relieved Officer Whitney and Officer

28  Martinez-Mendez from the cell in order to have all females present."); Joanna Flores Decl. ¶ 6;

1    Marcos Martinez Mendez Decl. ¶ 17; Brett Whitney Decl. ¶ 17 (ECF No. 34); Wendy Prado

2    Gonzalez Decl. ¶ 15.

3        In the FAC, plaintiff declares that defendants Wendy Prado Gonzalez, Kaylee Bubar,

4    Joanna Flores, Brett Whitney and Toni Taylor threw plaintiff on the ground in the safety cell, and

5    then restrained her on the ground so that she could barely breathe or move.  (ECF No. 7 at 5.)

6    Because the video footage does not visually show the entry into the safety cell, even if plaintiff's

7    allegations that defendants threw her on the ground of the safety cell are presumed to be true, the

8    Court concludes that defendants used reasonable force and had a need to use force from the

9    perspective of a reasonable officer considering the particular circumstances presented here.  Sgt.

10   Toni Taylor instructed the officers to remove plaintiff's jail issued clothing for the safety of

11   plaintiff and staff.  Toni Taylor Decl. ¶ 14.  The Court notes that plaintiff did not rebut the

12   evidence of her kicking officers or biting defendant Officer Wendy Prado Gonzalez on the way to

13   the safety cell.  After plaintiff was laying prone on the floor, in a figure four hold, officers

14   continued to restrain her until her clothing could be removed and all officers could exit the safety

15   cell.

16       The Court concludes that based on the particular circumstances presented here, defendant

17   officers' use of force during the December 22, 2022 incident was objectively reasonable from the

18   perspective of a reasonable officer on the scene.  See Kingsley, 576 U.S. at 397.  The officers'

19   actions in placing plaintiff in the safety cell were rationally related to a legitimate governmental

20   objective to prevent plaintiff from further injuring herself.  Jail officials may use force when

21   necessary.  See Kingsley, 576 U.S. at 400-01.  The officers conducted themselves reasonably and

22   professionally.  They adjusted how they interacted and responded at various times during the

23   December 22, 2022 incident, responding to the changing and complex circumstances.  After

24   plaintiff's arrival to the jail and before she was escorted to the cell, officers were patient with

25   plaintiff as she cried and they tried to comfort her.  For example, defendant Wendy Prado

26   Gonzalez asked plaintiff whether she wanted to go to the yard.

27       The officers did not use force until after plaintiff hurt herself by striking her own head

28   against the cell wall, which occurred when officers were not physically restraining her.  The

1   officers were patient with plaintiff, tried to calm her down, and took steps to protect her from

2   herself.  For example, defendant Officer Kaylee Bubar placed a blanket between plaintiff's head

3   and the cell wall while plaintiff was crying and screaming on the floor after she struck her own

4   head and had to be restrained on the floor.  In addition to hurting herself, plaintiff was screaming

5   things like "I don't want to do this anymore."

6          The officers quickly summoned mental health staff, and were encouraging and

7   supportive of plaintiff.  After plaintiff calmed down, the officers escorted plaintiff standing to the

8   medical station for evaluation <u>without</u> the use of any force.

9          After mental health staff determined that plaintiff needed to again be placed in a safety

10  cell on suicide watch and plaintiff was informed of this after her evaluation, plaintiff then began

11  screaming again and engaged in prolonged physical resistance, including kicking, biting, and

12  thrashing at the officers.  It was not until plaintiff began to physically resist going to the safety

13  cell that the officers used force, and plaintiff continued to physically resist throughout her escort

14  to the safety cell, requiring multiple officers to restrain her and then four officers to carry her,

15  with the video depicting officers struggling to maintain their holds due to her continued physical

16  resistance.  Plaintiff's active and prolonged physical resistance to being taken to the safety cell

17  justified the officers' use of force, which was objectively reasonable under these particular

18  circumstances.  Throughout this incident, the officers had a legitimate interest and need to ensure

19  plaintiff's safety and safe housing after she physically hurt herself by striking her head against the

20  cell wall and mental health staff determined that plaintiff should be returned to the safety cell for

21  suicide watch again.  "Prison [or jail] officials' duty to protect suicidal inmates is clearly

22  established."  <u>See</u> <u>Moriarty v County of San Diego</u>, 2019 WL 4643602 (S.D. Cal. Sept. 24, 2019)

23  (citing <u>Castro v. Cnty. of L.A.</u>, 833 F.3d 1060, 1068-71 (9th Cir. 2016) (giving standard for

24  pretrial detainee's claim for deliberate indifference to serious medical need); <u>Estate of Vargas v.</u>

25  <u>Binnewies</u>, 2017 WL 2289357, at *4 (E.D. Cal. May 25, 2017) (discussing duty to protect pretrial

26  detainee known to be at heightened risk for suicide)).  The officers also had a legitimate interest

27  in managing the jail facility and maintaining security.  <u>See</u> <u>Bell</u>, 441 U.S. at 547 (prison official

28  actions "needed to preserve internal order and discipline and to maintain institutional security").

1    **VII.    QUALIFIED IMMUNITY**

2              Defendants also contend that they are entitled to qualified immunity.  (ECF Nos. 18-1 at

3    17-20; 31 at 8-10.)  Plaintiff did not address the issue of qualified immunity in her oppositions.

4    (ECF Nos. 28, 30.)

5         **A.  Legal Standard for Qualified Immunity**

6              "Qualified immunity shields federal and state officials from money damages unless a

7    plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

8    (2) that the right was 'clearly established' at the time of the challenged conduct."  Ashcroft v. al-

9    Kidd, 563 U.S. 731, 735 (2011); Cuevas v. City of Tulare, 107 F.4th 894, 898 (9th Cir. 2024).

10   "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the

11   law.'"  Gordon v. County of Orange, 6 F.4th 961, 968 (9th Cir. 2021) (quoting White v. Pauly,

12   580 U.S. 73, 79 (2017)).  Thus, "[w]hen an officer asserts qualified immunity as a defense, . . .

13   [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the

14   officer's conduct violated a constitutional right.  If so, [courts] then ask whether the right in

15   question was clearly established at the time of the officer's actions, such that any reasonably well-

16   trained officer would have known that his [or her] conduct was unlawful."  See Orn v. City of

17   Tacoma, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted).  "The right must be settled law,

18   meaning that it must be clearly established by controlling authority or a robust consensus of cases

19   of persuasive authority."  See Tuuamalemalo v. Greene, 946 F.3d 471, 477 (9th Cir. 2019).

20   "Although [courts] must view the facts in the light most favorable to the nonmoving party, when

21   considering qualified immunity, [courts] are also limited to considering what facts the officer

22   could have known at the time of the incident."  Davis v. United States, 854 F.3d 594, 598 (9th

23   Cir. 2017).

24        **B.  Discussion**

25             Defendants move for qualified immunity on the grounds that the undisputed facts

26   demonstrate they did not violate plaintiff's Fourteenth Amendment rights and because it would

27   not have been clear to a reasonable official in defendants' positions that their treatment of

28   plaintiff violated clearly established law.  Because the Court found defendants' actions were

                                                    24

1  reasonable, no further inquiry as to qualified immunity is required.  See Los Angeles Cnty. v.

2  Rettele, 550 U.S. 609, 616 (2007) ("Because the court has found that there is no genuine issue of

3  material fact to support plaintiff's claims, 'there is no necessity for further inquiries concerning

4  qualified immunity.'") (quoting Saucier, 533 U.S. at 201).

5          Even if an inquiry into qualified immunity was required, the Court finds that plaintiff

6  failed to meet her burden to set forth cases that "articulate[ ] a constitutional rule specific enough

7  to alert these [defendants] in this case that their particular conduct was unlawful."  Sharp v. Cnty.

8  of Orange, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original).  Plaintiff did not address

9  qualified immunity or cite any cases.  The Supreme Court has "repeatedly told courts—and the

10  Ninth Circuit in particular—not to define clearly established law at a high level of generality."

11  Kisela v. Hughes, 584 U.S. 100, 104 (2018); see also Tuuamalemalo, 946 F.3d at 477 ("The right

12  must be settled law, meaning that it must be clearly established by controlling authority or a

13  robust consensus of cases of persuasive authority.").  Thus, while plaintiff was not required to cite

14  a case directly on point, "the constitutional question must be beyond debate."  al-Kidd, 563 U.S.

15  at 741.

16          The Court agrees with defendants that the December 22, 2022 incident presented unique

17  circumstances with an emotionally distraught plaintiff, who had previously been placed on

18  suicide watch in the safety cell and who first harmed herself by striking her head against the wall

19  of her cell, and then physically resisted defendants' efforts to place her in the safety cell as

20  directed by mental health staff.  Her prolonged physical resistance, which including kicking and

21  biting, warranted the additional use of force in transporting and securing plaintiff in the safety

22  cell.  Thus, even if it is assumed that the officers used additional force while transporting and

23  placing plaintiff in the safety cell or when removing the physical restraints while she was prone

24  on the safety cell floor, defendants are entitled to qualified immunity because it would not have

25  been clear to a reasonable officer under these circumstances that such additional use of force was

26  unlawful.  See Sharp, 871 F.3d at 911.

27          Therefore, if an inquiry into qualified immunity is required, the Court finds that

28  defendants are entitled to qualified immunity.

25

1  **VIII.  CONCLUSION**

2        Accordingly, IT IS HEREBY ORDERED that:

3        1.  Defendants' request for judicial notice (ECF No. 18-9) is granted.

4        2.  The automatic admissions to defendants' requests for admissions (ECF No. 18-8 at 5-

5  8) are withdrawn.

6        Further, IT IS RECOMMENDED that defendants' motion for summary judgment (ECF

7  No. 18) be granted, and this action be terminated.

8        These findings and recommendations are submitted to the United States District Judge

9  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

10  after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

13  objections shall be filed and served within fourteen days after service of the objections.  The

14  parties are advised that failure to file objections within the specified time may waive the right to

15  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

16

17  Dated:  June 10, 2025

18

19                CHI SOO KIM
              UNITED STATES MAGISTRATE JUDGE

20  /1/reed1101.msj.csk

21

22

23

24

25

26

27

28

26